IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIAM CHOATE,<br><br>　　　　Plaintiff,<br><br>v.<br><br>ATLANTA RADIO, LLC, a subsidiary of<br>CUMULUS MEDIA, INC., and CUMULUS<br>MEDIA, INC.<br><br>　　　　Defendants. | Civil Action<br>File No.: _____<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

COMES NOW Plaintiff William Choate ("Plaintiff"), by and through undersigned counsel, and files this Complaint against Defendants Cumulus Media, Inc. ("Cumulus") and Atlanta Radio, LLC ("Atlanta Radio") (collectively "Defendants"), respectfully alleging as follows:

### **INTRODUCTION**

1.　　This action arises in the context of a former employment relationship between Plaintiff and Defendants. Plaintiff was discriminatorily terminated by Defendants without cause and for pretextual reasons in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## JURISDICTION AND VENUE

2.      Plaintiff's claims present federal questions over which the court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e *et seq* ("Title VII").

3.      Venue is proper pursuant to 42 U.S.C. § 2000e *et seq* and pursuant to 28 U.S.C. § 1391(b) and (c), as every act of which Plaintiff complains occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

4.      Plaintiff is a resident of the State of Georgia and submits himself to the jurisdiction of this Court.

5.      Atlanta Radio is a Delaware corporation with its principal place of business at 3280 Peachtree Road, NE, Suite 2200, Atlanta, Georgia 30305. Atlanta Radio may be served with process by and through its registered agent in Georgia to wit: CT Corporation System, 3280 Peachtree Road, NE, Suite 2200, Atlanta, Georgia 30305.

6.      Cumulus is Delaware Corporation with its principal place of business at 3280 Peachtree Road, NW, Atlanta, Georgia 30345. Cumulus may be served with process by and through its registered agent in Georgia to wit: CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

7.      At all times relevant to this action, Defendants employed Plaintiff as an integrated enterprise as they maintained interrelated operations, common management, centralized control of labor relations and common ownership.

8.      At all times relevant to Plaintiff's claims, Defendants employed 15 or more employees for each working day in at least 20 or more calendar weeks, including Plaintiff.

9.      Plaintiff satisfied all conditions precedent to filing this action, including filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and receiving  Notices of Right to Sue ("Notices") within ninety (90) days. A true and accurate copy of the Notices are attached hereto as Composite Exhibit "A."

## FACTUAL ALLEGATIONS

### Plaintiff's Employment Agreement and Amended Agreement

10.      Plaintiff first became employed with Defendants approximately twenty-six (26) years ago in March of 1994, and at all material times faithfully served Defendants as an on-air personality most recently known as "Cadillac Jack."

11.      At the time of his termination, Plaintiff was the Morning Show host for "Kicks 101.5," a country music radio station owned and operated by Defendants.

12.      At all material times since the inception of Plaintiff's employment with Defendants, Plaintiff faithfully performed in his capacity as an on-air personality.

13.    Plaintiff was a pillar of the country music community in the Atlanta market having a reputation as one of the most renowned, kind, and creative radio personalities.

14.    Plaintiff was a loyal employee who always strived to perform at his best in order to maintain Defendants' goodwill.

15.    Plaintiff diligently followed all applicable policies as evidenced by his twenty-six (26) years of employment without reprimand or any other disciplinary action.

16.    As a specific condition of continued employment, on or about May 22, 2013 Plaintiff executed an Employment Agreement (the "Employment Agreement") with Atlanta Radio which is specifically identified in the Employment Agreement as a subsidiary of Cumulus.

17.    The Employment Agreement contemplated employment of Plaintiff by Defendants for a specific term from May 22, 2013 through May 21, 2017.

18.    Approximately one week prior to the expiration of the term of the Employment Agreement, Plaintiff and Defendants executed a First Amendment to Employment Agreement (the "Amended Agreement") which essentially contemplated Plaintiff's continued employment as an on-air personality for an additional specific term of four years from May 15, 2017 through May 14, 2021.

19.     The terms of the Amended Agreement and the Employment Agreement are integrated, and except as specifically altered by the Amended Agreement, the terms of the Employment Agreement remain in full force and effect. Amended Agreement at § 9. True and accurate copies of the Employment Agreement and the Amended Agreement are collectively attached hereto as Composite Exhibit "B."

20.     The Amended Agreement did, in fact, modify certain provisions from the Employment Agreement.

21.     Specifically, the Amended Agreement deletes the first part of Section 3 of the Employment Agreement in its entirety and inserted the following in its place:

> **TERM.** The term of Employee's employment by the Company under this Agreement (the "Employment Period") shall commence on May 15, 2017 *and shall continue until May 14, 2021*, unless earlier terminated pursuant to the provisions of Paragraph 5 of this Agreement. In the event Employee continues to provide services to the Company beyond the end of the Employment Period, then such continues employment shall be on an at-will basis and may be terminated by either party at any time for any reason, and all terms and conditions set forth in this Agreement shall continue to remain in full force and effect and shall be binding on both Employee and the Company until such time as Employee's employment with the Company is terminated.

> Exhibit "B" Amended Agreement at § 2 (emphasis added).

22.     Section 5 of the Employment Agreement specifically outlines the sole methods by which the Agreement could be terminated prior to its natural expiration, and by extension the natural expiration of the Amended Agreement.

5

23.     Specifically, Section 5.2 of the Employment Agreement details the grounds upon which the company could terminate Plaintiff's contract prior to the expiration of the term "for cause" stating in pertinent part:

> The Company may at any time terminate Employee immediately without notice or pay in lieu of notice for "Cause," which shall include, but is not limited to: (i) deceit or wrongful appropriation for personal use or benefit of Company property or money; (ii) continued disregard of directions by senior management of the Company after written notice or Employee's continued insubordination to Employee's supervisors after written notice; (iii) continued violations of Company policies or procedures after written notice, a material violation of Company policies or procedures, or Employee's refusal, after written notice, to comply with the Company's standards of good taste; (iv) excessive unexcused absences from work; (v) material breach by Employee of this Agreement; (vi) continued inattention to or sub-performance of Employee's duties or obligations as defined in this Agreement after written notice; (vii) assault or battery; (viii) conduct by Employee that is reasonably considered contrary to community standards of justice, honesty or good morals, including but not limited to an arrest or indictment on criminal charges, a guilty plea to a lesser-included offense or crime in exchange for withdrawal of a felony indictment, or felony charge by information, whether such charge arises under the laws of the United States or any other state within the United States, or an arrest or indictment of any crime that, in the Company's reasonable opinion, reflects adversely upon Employee or Employee's character; (ix) any action or conduct by Employee that causes public discredit to Employee or to the Company or may be reasonably likely to jeopardize a FCC license of any broadcast station owned by the Company; and/or (x) violation of any FCC rule or regulation, or any state or federal law. Aside from the provisions in this paragraph, the Company shall have no further obligations to Employee after termination.

> Composite Exhibit "B" Employment Agreement at § 5.2.

## Plaintiff's Employment Environment

24.     Plaintiff worked for Defendants for nearly three decades, growing in popularity as an on-air country music radio personality throughout the Atlanta market.

25.     Over the majority of Plaintiff's twenty-six (26) year tenure with Defendants, the environment was genial, supportive, and professional until Defendants hired Sean Shannon in April 2015 as the Vice President and Market Manager of Defendants.

26.     Mr. Shannon's position with Defendants placed him in a position of seniority over Plaintiff, and while Plaintiff did not directly report directly to Mr. Shannon, Mr. Shannon was the Manager for the entirety of the radio show market in Atlanta for Defendants and oversaw all radio operations within the Atlanta market.

27.     Upon information and belief, Mr. Shannon frequently provided input and was the final decision maker in the  termination of Defendants' employees.

28.     Following Mr. Shannon's employment with Defendants, the working environment of the Atlanta offices where Plaintiff reported daily dramatically changed.

29.     During this time, Plaintiff suddenly became the subject of ridicule from Mr. Shannon, falling victim to a barrage of derogatory comments from Mr. Shannon regarding Plaintiff's sexual orientation and failure to conform to gender norms.

7

30.     Plaintiff identifies as a bi-sexual male, an aspect of his personal life that he generally keeps to himself and only shares with those close to him.

31.     For example, Mr. Shannon continuously made remarks that Mr. Shannon had a strong "gaydar" and that "[he] couldn't believe how [Plaintiff] lived his life."

32.     Mr. Shannon further spoke openly in program meetings, with other employees present, that Mr. Shannon knew that Plaintiff was a "closeted homosexual" and that Plaintiff's wife would be "disgusted if she found out the news."

33.     Moreover, Mr. Shannon referred to Plaintiff's position as a country music radio personality and explained to Plaintiff that "[he] can't be 'gay' and be a country music personality in Atlanta."

34.     Mr. Shannon even ridiculed Plaintiff for leaving the room when Mr. Shannon would make sexually inappropriate comments to Plaintiff's former female co-host.

35.     Mr. Shannon's egregious behavior included comments about Plaintiff's salary and Mr. Shannon openly opined in company meetings that Plaintiff was overpaid.

36.     At one point, Mr. Shannon attempted to terminate Plaintiff's contract, but he was unsuccessful as the remaining decisionmakers of Defendants did not vote in favor of Mr. Shannon's proposal at that time.

37.     Due to Mr. Shannon's extensive harassment, bullying, and derogatory comments with regard to Plaintiff's sexual orientation and failure to conform to gender norms, Plaintiff felt intimidated and fearful for his future with Defendants.

38.     Upon information and belief, it was well-known by Defendants that Mr. Shannon was not accepting of non-heterosexual males and that Mr. Shannon voiced his disdain accordingly.

39.     Upon information and belief, it was further well-known that Mr. Shannon frequently made inappropriate comments to employees and staff members of a sexual nature.

40.     Despite Mr. Shannon's unprofessional and improper conduct, Plaintiff feared that any report of Mr. Shannon's actions and/or comments would cause Plaintiff to be retaliated against by Mr. Shannon; and therefore, Plaintiff did not report Mr. Shannon's statements to management although, upon information and belief, such conduct and statements were well-known by management.

## **Plaintiff's Termination**

41.     On July 12, 2019, Plaintiff attended a Luke Combs concert at Ameris Bank Amphitheater as the personal guest of his direct supervisor and Interim Program Director of "Kicks 101.5", Greg Frey.

42.     Upon belief, Mr. Frey was invited to attend this concert by Sony Music Nashville, the record label that represents Luke Combs.

43.     Mr. Frey accepted this personal invitation from Sony Music Nashville and invited Plaintiff to attend the concert as his personal guest.

44.     This Luke Combs concert was not an event sponsored by Defendants and Plaintiff was not representing Defendants in any capacity while in attendance.

45.     Plaintiff was not required to attend the concert in his capacity as an employee and on-air personality for Defendants.

46.     Plaintiff's attendance at the Luke Combs concert was not a condition of his employment.

47.     Mr. Frey did not invite Plaintiff to the concert in any capacity related to Plaintiff's employment with Defendants.

48.     Plaintiff accepted the personal invitation of Mr. Frey to enjoy music and socialize with friends including radio personalities from competing stations within the Atlanta market.

49.    At the concert, Plaintiff first visited the "radio room" area of the venue at the request of Mr. Frey where Mr. Frey and Plaintiff enjoyed alcoholic beverages together.

50.    The radio room is typically reserved for artists, personalities and media personnel.

51.    Over the course of the evening, Plaintiff viewed the concert from various areas of the venue with friends and employees of Plaintiff's competitor station WUBL.

52.    Plaintiff, along with Mr. Frey, fellow radio personalities and employees, and other friends and acquaintances drank alcoholic beverages throughout the evening, dancing and enjoying the collegial environment of the concert.

53.    The concert venue itself was very crowded throughout the event and many of the areas visited by Plaintiff were at or near capacity resulting in frequent close interactions with fellow radio personalities and other attendees.

54.    Throughout the evening, Plaintiff danced with multiple friends, colleagues, and radio personalities to include those employed by his competitor radio station WUBL in the tight confines of the concert venue.

55.    Nearing the end of the event, Plaintiff attempted to visit the VIP area of the venue.

56.    The VIP area is reserved for ticket holders, individuals with backstage passes, and celebrities and members of the entertainment industry and requires a wrist band be worn for admission.

57.    Plaintiff received a wristband from a friend, Holly Clauson, an employee with Live Nation.

58.    Upon reaching the VIP area, Plaintiff was informed that the area was over capacity and there would be no further admission into the area.

59.    Plaintiff requested to speak with Ms. Clauson, the Live Nation employee that issued Plaintiff's wristband, but she was not present at the venue that evening.

60.     Instead of remaining at the concert, Plaintiff decided to go home.

61.    Later that evening, and after Plaintiff left the venue,  Ms. Clauson of Live Nation sent an email to Mike Kee, Events Manager of Cumulus, at approximately 9:56 p.m., reporting that Corey Dylan, Plaintiff's "Kicks 101.5" morning show co-host and peer, was bullying her way in "the club" and was screaming obscenities at the staff before ultimately letting herself into the VIP area. A true and accurate copy of Ms. Clauson's email is attached hereto as Composite Exhibit "C."

62.    Ms. Clauson's email briefly referred to Plaintiff as having been escorted out by security and referred to Plaintiff as being "wasted" without any specific

references to Plaintiff's behavior or comments, instead only stating those specifics as related to Ms. Dylan.

63.    Upon information and belief, Ms. Dylan was never investigated, disciplined, reprimanded, or suspended despite the claims made against her in Ms. Clauson's email correspondence.

64.    Upon information and belief, Ms. Dylan is still employed by Defendants as an on-air personality.

65.    On July 13, 2019, Ms. Clauson's email correspondence was forwarded to Mr. Frey.

66.    Mr. Frey then forwarded the correspondence to Kriston Fancellas, Vice President of Human Relations for Cumulus on July 14, 2019. *See* Composite Exhibit "C."

67.    In Mr. Frey's correspondence, Mr. Frey acknowledged that he was at the concert that evening, but "did not witness the reported misbehavior." *See* Composite Exhibit "C."

68.    Mr. Frey additionally noted that Mr. Shannon, the Cumulus Vice President and the person whom regularly harassed Plaintiff, had been notified. *See* Composite Exhibit "C."

69.    Ms. Fancellas responded to Mr. Frey's July 14, 2019 correspondence stating that she did not believe the alleged offenses were terminable, but they should

be documented via a Disciplinary Warning Notice unless Mr. Frey felt differently. A true and accurate copy of Ms. Fancellas' reply is attached hereto as Exhibit "D."

70.     Mr. Frey replied to Ms. Fancellas seven (7) minutes later stating that he understood, and that Mr. Frey would be talking to "Sean" (Mr. Shannon) in a bit and will relay Ms. Fancellas' recommendations. *See* Exhibit "D."

71.     Mr. Frey relied on Mr. Shannon, Plaintiff's harasser and bully, to take part in making the decision that would determine Plaintiff's employment status with Defendants.

72.     On July 16, 2019, Plaintiff was summoned to a meeting with Mr. Frey and Joyce Murray, Office Manager at Defendants (the "Suspension Meeting").

73.     At the Suspension Meeting, Plaintiff was informed that he was being suspended without pay pending the findings of an "investigation" and was required to turn in his entry FOB and ID badge *before* the investigation began.

74.     Upon information and belief, it is not customary practice for Defendants to require an employee to turn in their ID badge and entry FOB while on suspension and during an investigation.

75.     During the investigation, Plaintiff was asked to provide a written timeline of events of the evening of July 12, 2019. A true and correct copy of Plaintiff's timeline submitted to Defendants is attached hereto as Exhibit "E."

76.     Plaintiff was not interviewed further or given the opportunity to address the allegations against him during the course of Defendants' alleged investigation.

77.     Upon completion of Defendants' "investigation", on July 22, 2019, Plaintiff was summoned to another meeting with Mr. Frey and Ms. Murray (the "Termination Meeting").

78.     At the Termination Meeting, Plaintiff was informed that he was terminated effective immediately and that he would not receive any further compensation from Defendants.

79.     Plaintiff was given a Notice of Employee Separation (the "Notice") which stated that Plaintiff's termination was "being terminated for cause pursuant to Section 5.2 of [his] Employment Agreement as a result of [his] highly unprofessional conduct at the Luke Combs concert on July 12, 2019." A true and correct copy of the Notice of Employee Separation is attached hereto as Exhibit "F."

80.     At the Termination Meeting, Plaintiff requested to review the findings of the investigation in order to better understand what alleged conduct led to his termination.

81.     Plaintiff was denied this request and instead Mr. Frey aggressively demanded that Plaintiff sign the Notice.

82.     Plaintiff did not sign the Notice as Ms. Murray explained to Mr. Frey that despite his demands, Plaintiff was not required to sign the Notice on that same day.

83.     Plaintiff additionally asked to have representation with him at the meeting or at least be allowed to make a phone call to his agent to discuss the subject matter of the Termination Meeting. Plaintiff's request was again denied.

84.     Plaintiff was notified of the allegations against him regarding a Live Nation employee and an employee of Plaintiff's competitor station, WUBL "The Bull."

85.     The allegations against Plaintiff regarding an employee from WUBL were reported by a competitor's (WUBL) station manager who did not have personal knowledge of any of the alleged events and did not attend the July 12, 2019 concert.

86.     The WUBL station manager allegedly reported that Plaintiff touched the buttocks of another male radio personality and  Plaintiff's direct morning show competitor.

87.     Defendants did not, however, obtain a written statement from the WUBL station manager, nor did they interview or obtain a statement from the alleged victim.

88.     Instead, Defendants relied on hearsay allegations, without eyewitness testimony, and the pretextual opinions of Mr. Shannon to determine Plaintiff's fate with Defendants.

89.     In other words, Plaintiff was ultimately terminated due to a complaint based on hearsay reported to Mr. Shannon, whose intolerance for Mr. Choate's sexuality was known and ignored.

90.     It was implied at the Termination Meeting that the details of Plaintiff's termination would be kept "quiet" as long as Plaintiff did not seek legal remedies for his improper termination.

91.     Plaintiff was terminated without cause on July 22, 2019 while his heterosexual, female co-host remains employed by Defendants despite having been accused of the same and/or strikingly similar "highly unprofessional conduct" cited in Plaintiff's Notice of Termination.

## COUNT I – GENDER DISCRIMINATION
## PURSUANT TO TITLE VII

92.     Plaintiff incorporates Paragraphs 1-91 herein by reference as if fully set forth herein.

93.     Defendants are employers within the meaning of Title VII.

94.     Plaintiff is a member of a protected class (male).

95.    Defendants took adverse employment actions against Plaintiff, including terminating his employment without justifiable cause and for pretextual reasons.

96.    Plaintiff at all times performed his duties owed to Defendants faithfully and in accordance with the standard set forth by Defendants.

97.    Despite Plaintiff's female co-host being accused of participating in the same or similar "highly unprofessional conduct" and alleged, Plaintiff's co-host remains employed by Defendants and upon belief did not suffer any adverse employment actions.

98.    Defendants treated Plaintiff's female co-host more favorably than Plaintiff.

99.    Defendants terminated Plaintiff's employment because of his gender and his failure to conform to the gender norms in violation of Title VII.

100.  Defendants' conduct alleged in this Complaint was willful and intentional.

101.  As a direct result of Defendants' actions, Plaintiff has suffered lost wages, future income, opportunities for advancement, lost endorsements, and other pecuniary and non-pecuniary damages (including emotional harm), all in amounts to be determined at trial.

## <u>COUNT II – SEXUAL ORIENTATION DISCRIMINATION<br>PURSUANT TO TITLE VII</u>

102.   Plaintiff incorporates Paragraphs 1-91 herein by reference as if fully set forth herein.

103.   Defendants are employers within the meaning of Title VII.

104.   Plaintiff is a member of a protected class (bi-sexual).

105.   Defendants took adverse employment actions against Plaintiff, including terminating his employment without justifiable cause and for pretextual reasons.

106.   Plaintiff at all times performed his duties owed to Defendants faithfully and in accordance with the standard set forth by Defendants.

107.   Despite Plaintiff's heterosexual co-host being accused of participating in the same or similar "highly unprofessional conduct" and alleged, Plaintiff's co-host remains employed by Defendants and upon belief did not suffer any adverse employment actions.

108.   Defendants treated Plaintiff's heterosexual co-host more favorably than Plaintiff.

109.   Defendants terminated Plaintiffs employment because of his sexual orientation in violation of Title VII.

110.   Defendants' conduct alleged in this Complaint was willful and intentional.

19

111.   As a direct result of Defendants' actions, Plaintiff has suffered lost wages, future income, opportunities for advancement, lost endorsements, and other pecuniary and non-pecuniary damages (including emotional harm), all in amounts to be determined at trial.

WHEREFORE Plaintiff prays for relief as follows:

a.      Judgment in his favor and against Defendants under all counts in this Complaint;

b.      Compensatory damages, general and special;

c.      Pecuniary and non-pecuniary damages, including emotional harm;

d.      Punitive damages for Defendants' willful violations of Title VII;

e.      Attorney's fees and all other fees and costs associated with this action;

f.      Pre-judgment interest; and

g.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

[DATE AND SIGNATURE ON FOLLOWING PAGE]

Respectfully submitted this 14th day of October 2020.

/s/ David A. Roberts
David A. Roberts
Georgia Bar No. 608444
droberts@hgrslaw.com
Brian S. Abrams
Georgia Bar No. 611649
babrams@hgrslaw.com
Jennifer K. Sniadecki
Georgia Bar No. 962598
jsniadecki@hgrslaw.com
**HALL, GILLIGAN,
ROBERTS & SHANLEVER LLP**
3340 Peachtree Road NE, Suite 1900
Atlanta, Georgia 30326
(t) 850-213-0604
(f) 404-537-5555

*Counsel for Plaintiff*